GISKAN SOLOTAROFF & ANDERSON LLP
90 Broad Street, 10th Floor
New York, New York 10004
(646) 964-9640
Jason L. Solotaroff
Amy E. Robinson
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

YAEL WEINSTOCK-SHEMESH,

                           Plaintiff,                          **COMPLAINT**

          -against-                                Dkt. No.

BANK HAPOALIM, B.M.

                           Defendant.

--------------------------------------------------------------------X

       Plaintiff Yael Weinstock-Shemesh, by her attorneys Giskan Solotaroff & Anderson LLP, for her complaint against Defendant Bank Hapoalim, B.M., ("BHI") alleges as follows:

## PRELIMINARY STATEMENT

       1.      This is an action, brought pursuant to the diversity jurisdiction of the Court, for sex and national origin discrimination in violation of the New York City Human Rights Law.

       2.      Ms. Weinstock-Shemesh, an Israeli woman, was a successful executive at Bank Hapoalim, a leading Israeli bank for over 26 years, including the last eight and a half years in Bank Hapoalim's New York branch ("New York Branch"). Ms. Weinstock-Shemesh was, throughout her career, paid significantly less than similarly situated male and non-Israeli employees. In addition, on November 30, 2020, the New York Branch terminated Ms.

Weinstock-Shemesh's employment when her performance was substantially superior to her male and non-Israeli colleagues. Moreover, the New York Branch justified Ms. Weinstock-Shemesh's termination based on alleged deficiencies that existed to a far greater degree among her male and non-Israeli colleagues.

3.     As a result of the discrimination and wrongful discharge, Ms. Weinstock-Shemesh has significant lost compensation and extreme emotional distress.

## THE PARTIES

4.     Ms. Weinstock-Shemesh is a citizen of Israel and a permanent resident of the United States who is domiciled in New York, New York.

5.     Defendant Bank Hapoalim, B.M. is a bank organized under the laws of Israel with its principal place of business in Tel Aviv, Israel.

## VENUE AND JURISDICTION

6.     Based on the diversity of citizenship of the parties, and the amount in controversy exceeding $75,000, this Court has jurisdiction over Ms. Weinstock-Shemesh's claims pursuant to 28 U.S.C. § 1332.

7.     Venue is properly before this Court pursuant to 28 U.S.C. § 1391 as Ms. Weinstock-Shemesh was employed in this District and therefore a substantial part of the events or omissions giving rise to the claim occurred in this District.

8.     This Court has personal jurisdiction over Defendant because it maintains an office and operates its business in New York State.

## FACTS

A. **Ms. Weinstock-Shemesh's Background.**

9.      Ms. Weinstock-Shemesh is a Certified Public Accountant in Israel, received her Bachelor of Business degree in Accounting and Finance from the College of Management Academic Studies in Israel, and previously served as a Lieutenant in the Israeli Defense Forces.

B. **Ms. Weinstock-Shemesh's Success and Accomplishments at the New York Branch.**

10.     Ms. Weinstock-Shemesh has worked for the New York Branch since May 2012.

11.     From 1991 to 2010, Ms. Weinstock-Shemesh worked at the Bank Hapoalim Israel Head Office, in the areas of Business Internal Audit and Middle Market Business in the Corporate Division.

12.     From 2010 to 2011, Ms. Weinstock-Shemesh was on leave from Bank Hapoalim Israel and mainly worked as an independent business consultant in the United States.

13.     In May 2012, Ms. Weinstock-Shemesh joined the New York Branch of Bank Hapoalim as a Team Leader and First Vice President. Ms. Weinstock-Shemesh was tasked with managing a $1 billion lending portfolio on behalf of Bank Hapoalim Israel. Not only did Ms. Weinstock-Shemesh manage the portfolio effectively, but she also created a local lending middle market portfolio of approximately $550 million in loans to local U.S.-Israeli companies. Gabriel Hamani, who later became the New York Branch's CEO and who managed that team before it was assigned to Ms. Weinstock-Shemesh, admitted that she had been able to generate new business, something he had not been able to do.

14.     By 2015, Ms. Weinstock-Shemesh had been assigned to create and lead two additional teams.

15.    The Investment Services team reached $1.2 billion in deposits and generated revenue through cash management activity. Ms. Weinstock-Shemesh managed to bring in new clients in this area, including dozens of high-net-worth individuals in Israel and the United States, as well as the leading investment houses in Israel.

16.    Ms. Weinstock-Shemesh also developed the New York Branch's Hi-Tech team. Despite competition from other banks that were more established in the Israeli technology sector, Ms. Weinstock-Shemesh quickly established a successful Hi-Tech practice that attracted business from leading technology companies and investors. In less than one year, the team had developed a portfolio of over $250 million in deposits and cash management activity.

17.    Ms. Weinstock-Shemesh's supervisory responsibilities grew from managing one employee to directly or indirectly supervising almost 20 employees, the majority of whom Ms. Weinstock-Shemesh had hired.

18.    Ms. Weinstock-Shemesh's accomplishments were also recognized outside of BHI. In 2019, Ms. Weinstock-Shemesh was named one Crain's New York Business' Notable Women in Banking and Finance.

19.    Despite the fact that Ms. Weinstock-Shemesh's groups managed the bulk of the accounts, account openings, and cash management transactions in the New York Branch, they maintained a better compliance record than other groups with fewer accounts. Due to Ms. Weinstock-Shemesh's experience in Hapoalim's Internal Audit area in Israel, she was able to lead her groups in managing to identify and avoid "red flag" and fraudulent accounts. In her eight and a half years as a manager in the New York Branch, only one account that she was responsible for was moved to the workout department, while other teams had much higher numbers of problem accounts, which caused losses to the bank.

4

20.     Ms. Weinstock-Shemesh also served as the public face of Bank Hapoalim, regularly representing the bank at events sponsored by New York's Jewish and Israeli communities.

21.     Ms. Weinstock-Shemesh was dedicated to her job and to the New York Branch, working long hours, weekends, during vacations, and even during her maternity leave.

22.     Ms. Weinstock-Shemesh also consistently exceeded her business generation goals and annually finished first in the year-end competition for new business.

23.     Consistent with Ms. Weinstock-Shemesh's success and accomplishments, she received extremely positive reviews until the very end of her tenure. Ms. Weinstock-Shemesh's annual evaluations featured high scores and comments about her high management capabilities.

24.     For example, in the 2014 review, Mr. Hamani stated Ms. Weinstock-Shemesh "is a very strong team leader, highly motivated with great management skills."

25.     In the 2017 review, Mr. Hamani stated Ms. Weinstock-Shemesh was a "very strong leader. Can lead a big group and manage performance and quality."

26.     In the 2018 review, which was the last review Ms. Weinstock-Shemesh received, she was rated as "outstanding" rating in Service Orientation; "commendable" in the following areas: Integrity/Ethics; Managing Performance; Planning; Problem Solving/Analysis; Quality and "proficient" ratings in all other areas.

27.     In addition, Ms. Weinstock-Shemesh was appreciated by the people with whom she worked. In Ms. Weinstock-Shemesh's April 2019 "360 review," in which she was reviewed anonymously by her manager, peers, and her direct reports, the overwhelming majority of comments were positive with many of the reviewers noting that Ms. Weinstock-Shemesh was

not being treated fairly by senior management. Among the specific comments were the following:

> I hope I can continue working for her for long time and can learn from her. I hope she'll get more opportunities to grow herself and people will treat her the way she treats us.

> I hope that she finds some stable ground in this shaky situation and that there was strategic sense to her losing the division.

> I hope that she doesn't continue to get these slaps in the face. Gabi does not appreciate her and the challenges she faces.

> Yael is sharp and has a lot of knowledge about what she does.

> She is very helpful when we bring questions to her, she loves the opportunity to teach you.

> She knows what she is doing. She understands the financials, everything from both the Israeli and the U.S. side.

> She is a great marketing person, she knows how to connect with people, she knows everything about everyone. She is well connected in the industry.

> Yael is a good business woman. She works late, stays close to the customers, and is very active in how she reaches out to clients and gets new clients. She does not sit and wait for business to come to her.

> She is one of the most ambitious women I've ever met, she is determined and demanding. She is a good role model.

> Her commitment is clear to everyone and her team. She works very hard, she is "all in" for the bank and doing the best she can for the customer.

> She really listens. She is understanding, friendly. The team has a good atmosphere.

> She is supportive, she takes care of her team. She can see you and how you feel, she asks the right questions.

> She manages everyone and it is great. Everything works. People are motivated and know what they are doing. She delegates well.

She is friendly and caring. She is always checking to make sure a new employee is a good fit for the team. And it's worked. We are happy to come to work.

I love her like I love my sister, she is pleasant and nice and has a clear understanding of what she wants and what she needs.

C. **Ms. Weinstock-Shemesh Falls Victim to the Discriminatory Culture at the New York Branch.**

28.     Despite Ms. Weinstock-Shemesh's objective success, she, and other female and native Israeli employees, were not treated fairly by the senior managers of the New York Branch.

29.     The senior managers at the Branch exhibited sexist attitudes.

30.     The CEO of the Branch for virtually all of Ms. Weinstock-Shemesh's tenure, Gabriel Hamani, told Ms. Weinstock-Shemesh that while he felt free to contact her at all hours, nights, weekends, and during maternity and medical leave, he would never contact the male employees who worked for him after working hours.

31.     Hamani encouraged Ms. Weinstock-Shemesh to hire a particular candidate for a managerial position in the Hi-Tech group because "she was the most beautiful woman he has ever seen."

32.     Hamani's difficulty working with women was shown when he fired a series of female administrative assistants (and made one quit) in a short period of time.

33.     Hamani also demoted a female employee, Yael Oshman, from a team leader position while she was on maternity leave.

34.     The position was assigned to a male employee, Max Furman.

35.     Mr. Furman was less qualified for the role because his sales skills were inferior to those of Ms. Oshman.

36.   Mitch Barnett, the Executive Vice President of the New York Branch, has expressed negative feelings toward several female employees.

37.   Mr. Barnett told Ms. Weinstock-Shemesh that he did not want to work with Marline Alexander.

38.   Ms. Alexander, in turn, told Ms. Weinstock-Shemesh that Mr. Barnett has issues working with women.

39.   Mr. Barnett demoted an outstanding young female employee, Limor Wadler, for pretextual reasons and pushed to promote a much less qualified male employee to take her place.

40.   Almost all of the other women who reported to Mr. Barnett ended up leaving the Branch.

41.   Consistent with these discriminatory attitudes, the New York Branch paid Ms. Weinstock-Shemesh less than her similarly situated male colleagues.

42.   When Ms. Weinstock-Shemesh joined the New York Branch in 2012, her base salary was $140,000 and at the time of Ms. Weinstock-Shemesh's termination, her base salary had been increased to $238,000.

43.   According to what Ms. Weinstock-Shemesh was told by Howard Applebaum, the former Executive Vice President of the New York Branch, during this period the New York Branch paid Ms. Weinstock-Shemesh hundreds of thousands of dollars less per year than it paid her similarly situated counterparts, Mitch Barnett and Ralph Mascia, who were hired at the same time as Ms. Weinstock-Shemesh.

44.   Barnett and Mascia's performances were significantly worse than Ms. Weinstock-Shemesh's performance.

45.     Compared to Ms. Weinstock-Shemesh, Barnett and Mascia brought smaller amounts of business to the bank, managed far fewer accounts, and had much higher numbers of bad loans and more compliance issues.

46.      Not only were Barnett and Mascia both paid more than Ms. Weinstock-Shemesh, they were also both promoted from Senior Vice President to Executive Vice President when they were given Division Head responsibilities.

47.     Ms. Weinstock-Shemesh, meanwhile, did not receive the promotion to Executive Vice President when she was named a Division Head, leaving her the only Division Head without that title. This was despite excellent performance reviews and highest ratings.

48.     Despite her strong performance, Ms. Weinstock-Shemesh had first one department, and then another, removed from her authority and was demoted for no apparent reason other than to placate and elevate the profile of male executives.

49.     In April of 2019, the Investment Services team was taken from her and assigned to Moti Elasi. This was done to placate Elasi, who, as detailed below, was an extremely difficult employee, an abusive manager, and who was unhappy reporting to a female manager, such as Ms. Weinstock-Shemesh.

50.     In February 2020, the Hi-Tech team was taken from Ms. Weinstock-Shemesh and moved to a division headed by a male manager, Steve Caligor, with another male manager, Max Furman, appointed to Team Leader, over a female manager Yael Oshman, who was on maternity leave.

51.     Ms. Weinstock-Shemesh was, at that time, demoted from Division Head to Team Leader.

52.     The difference between the New York Branch's treatment of Ms. Weinstock-Shemesh and its treatment of Mascia and Barnett highlights the culture of sex discrimination at the New York Branch.

53.     Based on Mascia's poor performance, which included a number of problem loans and a large fraudulent loan in his portfolio, Hamani took Mascia's supervisory responsibilities away but kept him employed at his then-current salary and created a position as National Head of Sales for him.

54.     Similarly, Barnett was recently relieved of his management responsibilities and given a business development role, also at his current salary.

55.     Meanwhile, Ms. Weinstock-Shemesh, whose performance remained strong, was demoted and ultimately terminated.

56.     The Branch also paid Israeli employees such as Ms. Weinstock-Shemesh less than similarly situated non-Israeli employees, such as Barnett and Mascia.

57.     In addition, in Ms. Weinstock-Shemesh's own department, she found that despite her efforts to ensure non-discriminatory compensation, non-Israeli employees were paid more than similarly situated Israeli employees.

58.     An example of this pay disparity was the starting salary of $170,000 paid to Peter Stanczewski, a new non-Israeli member of Ms. Weinstock-Shemesh's team hired in July 2019. Not only was this salary only $65,000 less than that of Ms. Weinstock-Shemesh, the Division Head, but it was significantly higher than the salaries paid to high performing Israeli members of the group, such as Uri Shusterman, a First Vice President. Mr. Shusterman's starting salary was $90,000 and even after three years of strong performance, he is still being paid significantly less than Mr. Stanczewski, who holds the lower title of Vice-President.

D. **Ms. Weinstock-Shemesh is Terminated for Discriminatory and Pre-Textual Reasons.**

59.     Despite Ms. Weinstock-Shemesh's success, the bias against female employees eventually led to the termination of her employment.

60.     On September 30, 2020, the New York Branch's HR Department sent Ms. Weinstock-Shemesh a letter informing her that "BHI Management has lost confidence in you, and is considering terminating your employment …."  The letter listed the following specific concerns: 1) The employee satisfaction survey allegedly indicated lower employee satisfaction scores for Ms. Weinstock-Shemesh's team was less than the scores for other teams; 2) Ms. Weinstock-Shemesh had allegedly engaged in instances of unprofessional behavior; 3) There was excessive turnover on her teams; and 4) Ms. Weinstock-Shemesh had not sufficiently managed her team's compliance. The letter invited Ms. Weinstock-Shemesh to meet with the Branch's management and human resources to discuss the concerns.

61.     For each of the alleged concerns, however, the facts were either distorted or Weinstock-Shemesh's male counterparts had engaged in worse conduct or behavior without being terminated or even reprimanded.

62.     With respect to the employee satisfaction survey, the letter did not reference or include complete results of the employee satisfaction survey and appeared to cherry pick categories that made Ms. Weinstock-Shemesh team's results look worse than they actually were.

63.     The letter only referenced two categories, "overall employee satisfaction" and "cross-departmental feedback," while the survey included a number of other categories in which Ms. Weinstock-Shemesh's team presumably did well and likely out-performed other teams.

64.     Even the survey results in the two categories were not particularly damning. The overall employee satisfaction was 57 percent (compared to 74 percent branch-wide) and the

cross-departmental feedback dissatisfaction was only 20 percent (compared to seven percent branch wide).

65.     The letter was also contradicted by the anonymous 360 review in which Ms. Weinstock-Shemesh's peers and direct reports had rated her positively as a leader.

66.     Moreover, there were reasons, unrelated to Ms. Weinstock-Shemesh, for lower employee morale in Ms. Weinstock-Shemesh's department. The group consisted of Israeli employees and, as set forth above, those employees were underpaid at the Branch. Moreover, Ms. Weinstock-Shemesh had only eight employees reporting to her and given the small sample size, one employee's subjective opinion could have been responsible for the survey results being lower than other departments.

67.     With respect to the alleged instances of unprofessional behavior toward employees, it was admitted in the letter that none of the employees who were the alleged recipients of the behavior wanted to file a complaint and therefore there was no finding that Ms. Weinstock-Shemesh had engaged in any specific unprofessional acts. The other alleged inappropriate conduct was either not in violation of the Branch's rules, such as Ms. Weinstock-Shemesh recording a conversation with Hamani, or trivial, such as Ms. Weinstock-Shemesh not updating her LinkedIn profile to reflect the fact that Hamani had demoted her.

68.     Meanwhile, male senior executives at the Branch had committed unprofessional and inappropriate acts, that were the subject of specific complaints, with no consequences.

69.     The most egregious of these were Moti Elasi and Hamani.

70.     In early 2019, Elasi was accused of sexual harassment by a female employee, who alleged that he touched her inappropriately, called her pet names, and commented that she was "playing with fire" in reference to the outfit she was wearing.

71.     Even though the New York Branch's human resources department told the employee it would conduct an investigation, no investigation was conducted.

72.     The Branch resolved the complaint by entering a settlement with Ms. Jacobowitz under which she was paid to leave the bank and not disclose the circumstances of Elasi's sexual harassment.

73.     In addition, the following employees made complaints about Elasi's bullying and rude, vulgar behavior to senior management or human resources: Oded Manor, Uri Shusterman, Nurit Rom, Yael Oshman, Rebecca Jacobowitz, Leerone Tal, Baruch Deutsch, Itai Guttman, Shachar Ben-David, Daniel Tamir, and Asher Guigui. These complaints were either made directly to senior management or human resources or forwarded to them. Baruch Deutsch's complaint was typical:

> [Elasi] was not someone I wanted to work with
> In my opinion, he is unprofessional, inappropriate and vulgar
> He was the least productive person on the team
> He belittles co-workers, and wishes bad on them
> He is intensely disliked by most of his co-workers

74.     Hamani's bullying behavior toward employees was well-known at the Branch. Hamani would routinely scream at employees, insult them during meetings, speak badly about employees to other employees, and share employees' personal information.

75.     Hamani was the first Branch manager to be assigned an executive coach to improve his behavior. The behavior was discussed at a Branch off-site management seminar in June or July of 2018. When asked to draw a picture that described how other people saw him at the Branch, Hamani drew a monster with blood coming out of his mouth and admitted that this is the way the branch managers and employees perceived him. Among the employees Hamani

bullied and harassed were Howard Ross, Howard Applebaum, Dean Blom, Terry Tablin, and Brian Schumann.

76.     The issues concerning Branch CEO Hamani were well known to the Branch's Human Resources department, which reported to Hapoalim HR in Israel, as well as to Hamani's superiors in Israel.

77.     In one incident, Hamani behaved in his characteristically abusive manner on a call with Hapoalim staff in Israel, who later called Ms. Weinstock-Shemesh to express their concern.

78.     Hapoalim staff in Israel also registered concern about the serial terminations of Hamani's female administrative assistants.

79.     Additionally, there were other complaints about Hamani that were passed on to Hapoalim management in Israel.

80.     Hapoalim's decisionmakers were well aware of the extremely problematic behavior of male senior managers but took no action.

81.     Yet, despite this egregious behavior, neither Moti or Hamani were terminated or even disciplined.

82.     Moti was promoted, is still employed at the Branch, and, indeed, was assigned to the Investment Services team after it was taken from Ms. Weinstock-Shemesh.

83.     Hamani voluntarily left to accept another position with a Branch client in July of 2020.

84.     With respect to the allegedly excessive turnover in Ms. Weinstock-Shemesh's department, as set forth above, there was high turnover throughout the Branch during this period. The employees in her department who left were underpaid and left for better paying jobs at other financial institutions and companies.

14

85.    Moreover, many of the employees who left praised Ms. Weinstock-Shemesh in their exit interviews. For example, when Asaf Levy, an employee on Ms. Weinstock-Shemesh's team, left the Branch, he stated in his exit interview that Ms. Weinstock-Shemesh was "the most amazing boss [he] ever had," that he had joined the Branch because of Ms. Weinstock-Shemesh, that he had enjoyed his work and had learned a lot, and that he was only leaving because he had been promised a much higher salary at a technology company.

86.    In other exit interviews, employees who left Ms. Weinstock-Shemesh's team also stated that they were leaving because of low pay, feeling that Israelis were undervalued, Hamani's violent management style, problems with other departments such as legal, compliance, and loan operations, and other complaints not attributable to Ms. Weinstock-Shemesh.

87.    Additionally, turnover was a problem throughout the Branch.

88.    Nine senior managers left the Branch in 15 months.

89.    Of the nine employees who were transferred from Ms. Weinstock-Shemesh to other managers, seven left the Branch while reporting to the other managers.

90.    Indeed, the turnover of Israeli employees, who were generally underpaid, was significantly higher among those employees not reporting to Ms. Weinstock-Shemesh than among those reporting to her.

91.    Finally, with respect to compliance, only one third of the issues mentioned in the audit report referenced in the HR letter actually involved Ms. Weinstock-Shemesh's department and the report described those issues as not serious. The CEO at the time, Yair Talmor, admitted in a conference call that the findings were minor.

92.    Moreover, any compliance issues related to Ms. Weinstock-Shemesh paled in comparison to those attributable to male executives.

15

93.     Most significantly, Hamani ran roughshod over the Branch's credit procedures and standards to obtain loans for his friends and associates. These customers were known in the Branch as "FOGs" for "Friends of Gabi" and it was well-known among the Branch's credit officers that it was difficult, if not impossible, for them to deny a loan application of a FOG, even if the application did not meet the Branch's credit standards. One particular client Hamani pressured the Branch about was the Nakash group. During a credit committee meeting, after credit officers requested that the Branch's exposure to this client be reevaluated, Hamani intimidated the committee into not taking any action concerning this client.

94.     Additionally, Hamani pressured the Branch's credit officers to approve questionable loans at year end to boost the Branch's performance numbers and Hamani's compensation.

95.     Even after Hamani left the Branch, he continued to adversely affect the Branch's compliance procedures. Hamani took a position with NorthWind Group, an existing customer of the Branch. Shortly thereafter, NorthWind engaged in a "capital call" transaction with the Branch. Although Ms. Weinstock-Shemesh's Israeli Business team was the only team with the expertise in handling those transactions, Hamani arranged for the deal to be assigned to another department and employee who admitted that she had never seen this type of transaction before, likely so that he could have more influence over the process.

96.     On October 28th, Ms. Weinstock-Shemesh met with the Branch's management, specifically Barnett, Branch HR, and outside counsel and refuted the "concerns" in the September 30 letter point by point. Ms. Weinstock-Shemesh also pointed out that the Branch had failed to provide her with adequate information, as was required by the New York Branch procedures and Israeli law, to defend herself even more effectively.

97.     Even though the Branch indicated that it would consider Ms. Weinstock-Shemesh's statements in determining whether, in fact, she would be terminated, there is no evidence any such consideration occurred.  On November 5, 2020, Ms. Weinstock-Shemesh was informed she would be terminated.

**FIRST CLAIM FOR RELIEF**
(Sex Discrimination in Violation of New York City Human Rights law)

98.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

99.      Defendant discriminated against Plaintiff in the terms and conditions of her employment based on her sex in violation of the NYCHRL.

**SECOND CLAIM FOR RELIEF**
(National Origin Discrimination in Violation of New York City Human Rights law)

100.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

101.      Defendant discriminated against Plaintiff in the terms and conditions of her employment based on her national origin in violation of the NYCHRL.

WHEREFORE, Plaintiff demands judgment:

1.     Reinstating Plaintiff's employment with Defendants and upon reinstatement, enjoining Defendant from discriminating against Plaintiff in violation of the NYCHRL in the terms and conditions of her employment;

2.     Awarding Plaintiff back pay;

3.     Awarding Plaintiff compensatory damages including damages for emotional distress;

4.      Awarding punitive damages;

5.      Awarding reasonable attorneys' fees, costs, and expenses, and

Granting such other relief to the Plaintiff as the Court may deem just and equitable.

## **<u>JURY DEMAND</u>**

Plaintiff demands trial by jury of all issues as of right by a jury.


Dated:          New York, New York
                April 23, 2021

                                    GISKAN, SOLOTAROFF & ANDERSON LLP


                                    s/_____
                        By:     Jason L. Solotaroff
                                90 Broad Street, 10th Floor
                                New York, New York 10004
                                646-964-9640
                                jsolotaroff@gslawny.com
                                *ATTORNEYS FOR PLAINTIFF*

18